**In Re: ERIE GOLF COURSE**

**Appeal of: City of Erie.**

Commonwealth Court of Pennsylvania.

Argued Oct. 15, 2008.
Decided Jan. 7, 2009.

Gregory A. Karle, Erie, for appellant.

Paul F. Curry, Erie, for appellee.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge SMITH–RIBNER.

The City of Erie (City) appeals from an order of the Erie County Common Pleas Court (trial court) that denied the City's petition to abandon the use of dedicated public property known as "Erie Golf Course" filed pursuant to the act commonly known as the Donated or Dedicated Property Act (Act), Act of December 15, 1959, P.L. 1772, 53 P.S. §§ 3381–3386. The City argues that the trial court erred by refusing to apply the Act on the basis that the City formally accepted the offer dedicating the property to a public use and erred by relying on the common law public trust doctrine instead of the available statutory remedy.

The City submits that the trial court applied an incorrect standard in reviewing the evidence and construed too narrowly the City's request under Section 4 of the Act, 53 P.S. § 3384, and that it erred by concluding that the City presented insufficient evidence to support its opinion that the original use of the property is no longer practicable and has ceased to serve the public interest. This matter was heard by the Court *en banc* to address the inconsistencies between *In re Bangor Memorial Park*, 130 Pa.Cmwlth. 143, 567 A.2d 750 (1989) (*Bangor II*), and *Vutnoski v. Redevelopment Authority of Scranton*, 941 A.2d 54 (Pa.Cmwlth.2006), adopting the view that the Act applies only when there is no formal record of acceptance of property by a political subdivision, and *White v. Township of Upper St. Clair*, 799 A.2d 188 (Pa.Cmwlth.2002), and *Petition of Westmont*, 131 Pa.Cmwlth. 530, 570 A.2d 1382 (1990), assuming that the Act applies in circumstances where there is a formal record of acceptance and dedication of property.

I

In its June 27, 2007 opinion, the trial court found that on August 13, 1926 the Erie Golf Club resolved to convey the parcels now known as Erie Golf Course to the City for $1 and the City's assumption of a mortgage of $15,000. On August 24, 1926, the City Council enacted an ordinance authorizing the purchase.[1] The deed transferring the property to the City was duly recorded on August 31, 1926, and it included a deed restriction requiring the City or its successors or assigns to keep and maintain the premises as a golf course or for public park purposes or both.[2] The City

---

1. The Ordinance, Intervenors' Ex. A, Reproduced Record (R.R.) 1752a, 1754a, provides:
   Section 3. That in addition to the consideration set forth in Section 2 hereof, and as a part of the consideration for this conveyance, The City of Erie in the deed of conveyance shall by the acceptance thereof covenant and agree to and with the [Erie Golf Club], its successors and assigns, that the [City], its successors and assigns, shall and will at all times hereafter and forever, keep and maintain the premises hereby conveyed, as a golf course or for public park purposes, or both.

2. The deed, Petitioner's Ex. 3, R.R. 1341a, 1343a, includes the following:
   1. And the [City], in part consideration for this conveyance, does for itself, its successors and assigns, by the acceptance of this conveyance, covenant and agree to and with the [Erie Golf Club], its successors and assigns, that the [City], its successors and assigns, shall and will at all times hereafter and forever, keep and maintain the premises hereby conveyed, as a golf course or for public park purposes or both.
   . . . .
   It is distinctly covenanted and agreed between the parties hereto that all the covenants and agreements above expressed shall be held to run with and bind the land hereby conveyed, and all subsequent owners and occupants thereof, and the acceptance of this deed shall have the same effect and binding force upon the [City], its successors and assigns, as if the same were signed and sealed by the [City].

has maintained and used the dedicated property as a golf course, although the trial court noted that in winter people have used it for activities such as skiing and year round for walking, bird watching and so forth. The City owns Downing Golf Course and J.C. Martin Golf Course as well, and it operates the three courses as an enterprise fund separate from the general fund.

In 2004 during the administration of Mayor Richard Fillippi, City Council approved a bond issue for $2,250,000 to make improvements to the golf courses; approximately ninety percent was spent on Erie Golf Course. Under the general obligation note secured by the City's assets, the City is obligated to pay approximately $160,000 per year until 2024 when an estimated $1,200,000 balloon payment is due. It undertook significant renovations in 2005 and completed them in the summer of 2006, but under the administration of Mayor Joseph Sinnott the City permanently closed Erie Golf Course on October 31, 2006. On December 20, 2006, City Council passed a 2007 budget and resolution authorizing advertisement for bids for sale of the golf course; the budget provided no funding for operation of the golf course. The City filed its petition on February 26, 2007, and the Lake Erie Region Conservancy and Committee to Keep Erie Golf Course Open along with two residents (Intervenors) were later granted leave to intervene.

After the trial court denied the petition, the City filed its notice of appeal and statement of matters complained of on appeal under Pa. R.A.P.1925(a) and listed twelve points. In its August 31, 2007 opinion the trial court concluded that the City waived eleven of its issues.[3] It deemed to be preserved the questions of whether the Act applies and whether it abused its discretion in ruling that the City must hold Erie Golf Course consistent with the original dedication.

The trial court quoted Sections 2 through 4, 53 P.S. §§ 3382–3384:

Section 2. All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility, or dedicated to the public use or offered for dedication to such use, where no formal record appears as to acceptance by the political [sub]division, as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.

Section 3. All such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act.

Section 4. When, in the opinion of the political subdivision which is the

---

3. Pa. O.C. Rule 7.1(a) provides that in general exceptions may be filed no later than twenty days after entry of an order, decree or adjudication that would become a final order under Pa. R.A.P. 341(b) or 342 following disposition of the exceptions; however: "Failure to file exceptions shall not result in waiver if the grounds for appeal are otherwise properly preserved." The *Explanatory Note* to Rule 7.1 states in part that Rule 7.1 permits but does not require exceptions but that the election of an aggrieved party not to file exceptions will not result in waiver of issues on appeal. It adds, however, that "nothing in this rule is intended to abrogate the requirement of decisional law or court rule mandating that issues on appeal be preserved by a timely petition, answer, claim, objection, offer of proof or other appropriate vehicle." *Id.*

trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest, or where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication because of the lack of a record of the acceptance of the dedicated land or buildings, the trustee may apply to the orphans' court of the county in which it is located for appropriate relief. The court may permit the trustee to—

(1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes.

(2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.

(3) In the event the original trust purpose is no longer practicable or possible or in the public interest, apply the property or the proceeds therefrom in the case of a sale to a different public purpose.

(4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hearing the evidence that there is no acceptance by implication arising out of public user or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

The trial court noted the City's argument that the Act applies to this case, citing *White* and *Petition of Westmont.* Intervenors claimed that common law public trust principles applied as established in *Trus-*

*tees of Philadelphia Museums v. Trustees of University of Pennsylvania,* 251 Pa. 115, 96 A. 123 (1915), and its progeny, which includes *In re Bangor Memorial Park,* 4 Pa. D. & C.4th 343 (1988) (*Bangor I* ), which was affirmed by *Bangor II.*

The trial court quoted the rule of statutory construction from 1 Pa.C.S. § 1903 that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage [and that] [g]eneral words shall be construed to take their meanings and be restricted by preceding particular words." The trial court also noted the rule that when words of a statute are clear there is no need to look beyond their plain meaning. *Colville v. Allegheny County Retirement Board,* 592 Pa. 433, 926 A.2d 424 (2007). It concluded that the language in Section 2 of the Act ("where no formal record appears as to acceptance by the political [sub]division, as a public facility") expressly indicated that the Act applies only when there is no record that the political entity accepted the donated or dedicated property as a public facility. It also stated that *White* and *Westmont* provided no guidance as they did not address whether the Act applied. Ultimately, the trial court ruled that the Act did not apply because a clear formal record exists to show that the City accepted Erie Golf Course and agreed to keep it as a golf course or for public park purposes or both.

The trial court instead applied common law public trust doctrine as enunciated in *Trustees of Philadelphia Museums* and *Bangor I.* In *Trustees of Philadelphia Museums* the city passed ordinances setting aside certain land as a public park for museum use for the benefit of the citizens, and then several years later it passed other ordinances attempting to repeal the original ones in order to convey the property to a university. The Supreme Court

held that the city had no power or authority to convey the dedicated property for private purposes, quoting *Davenport v. Buffington,* 97 F. 234 (8th Cir.1899), that when a state becomes the proprietor of a municipality and dedicates streets and parks to public use it cannot revoke the dedication after lots have been sold, streets have been graded and parks cared for and improved and that a municipality that dedicates land as a park is estopped from selling the property or appropriating it to other uses. In *Borough of Ridgway v. Grant,* 56 Pa.Cmwlth. 450, 425 A.2d 1168 (1981), the Court held that a borough had established clear and unequivocal intent to devote a property to public park use and rejected a proposal to construct a fire house on part of the property as incompatible with such use. In *Bangor I* a borough petitioned under the Act to convey to a school district to construct an elementary school part of land accepted in the 1930s and formally dedicated in 1950 as a public park; the court refused under the public trust doctrine to permit the conveyance. Under these decisions the trial court determined that the public trust doctrine required the City to keep and maintain the property as a golf course or for public park purposes, although under the deed restriction it could be sold if the successor agreed to the same restriction.

Assuming *arguendo* that the Act applied, the trial court nevertheless determined that the City's petition still would fail. The trial court summarized the testimony of the witnesses, including testimony as to the appraised value and to the opinion of several officials as to the financial effect of continuing to operate Erie Golf Course.[4] The trial court was not impressed by the financial evidence, and it concluded that Erie Golf Course need not generate any specific amount of income to be a viable asset to the community. It

4. The trial court noted that James Powers, hired to perform an appraisal, concluded that as a golf course that was a going concern the property would be worth $600,000, but for the highest and best use for development purposes it would be worth $1,800,000. The trial court perceived "flaws" in the analysis, including failure to consider that Erie Golf Course was designed by a preeminent golf course architect and that Powers was not aware of the deed restriction. He did not visit nearby municipally owned golf courses nor analyze all three City golf courses together. Further, as Mayor Sinnott acknowledged, there is a dump on the property, and Powers did not consider the effect of the dump. Joseph Paparone, a certified public accountant, who audited the City's financial statements, testified that for the years 2004 and 2005 he issued a qualified report due to recurring losses and the general fund's overall deficit and growing debt. Ronald Komorek, the City's Director of Finance, testified that a review of all three golf courses showed operating losses each year from 2001 through 2005, but he did not analyze Erie Golf Course separately. In September 2006 there was a surplus from the golf enterprise of $174,033, but Komorek concluded in part based upon an early intervention report that in general golf in the City was not a viable operation.

David Mulvihill, the Assistant Director of Public Works, detailed the extensive improvements to Erie Golf Course, costing roughly $2,000,000. He prepared a report tracking revenues and expenditures for each course, assigning ninety percent of the debt service to Erie Golf Course. He acknowledged that the City did not raise fees or conduct a marketing study before closing the golf course. Mayor Sinnott testified that in the years 1997, 1998, 2001 and 2002 the other golf courses showed surpluses, but Erie Golf Course showed deficits as high as $123,763. When he took office the City had serious financial problems, with a structural deficit, operational deficits, drained reserves and ongoing layoffs including in public safety positions. The 2006 budget was short by $800,000 because a bond refinancing loan did not come through due to a lower bond rating. He made the decision not to request funding for Erie Golf Course for 2007, and City Council agreed. If the golf enterprise fund were unable to pay the debt service on the loan, then it would have to be paid from the general fund.

found significant that the City cited only the burden of the debt service that it accepted some three years earlier, apparently believing that it would be feasible to repay the debt over time. Also, it stated that no evidence was presented as to impracticability of using the land as a public park.[5]

## II

The City first contends that the trial court erred in its interpretation of Section 2 of the Act by determining that the phrase "where no formal record appears as to acceptance by the political [sub]division, as a public facility" in that section limits the applicability of the entire Act only to cases where there is no formal record. The City invokes the principles that a statute must be construed if possible to give effect to all its provisions and that the legislature intends the entire statute to be effective and certain. 1 Pa.C.S. §§ 1921(a) and 1922(2). It notes *Commonwealth v. Packer,* 568 Pa. 481, 491, 798 A.2d 192, 198 (2002) (quoting *John Hancock Prop. & Cas. Ins. Co. v. Insurance Department,* 123 Pa.Cmwlth. 578, 585, 554 A.2d 618, 622 (1989)), where the Supreme Court, citing 1 Pa.C.S. § 1903, referred to a "well-established cannon of construction that courts should generally apply qualifying words or phrases to the words immediately preceding them" and stated that "[q]ualifying words 'do not extend to or include other words, phrases or clauses more remote, unless such extension or inclusion is clearly required by the intent or meaning of the context or disclosed by an examination of the entire act.' "

Therefore, the phrase in Section 2 "where no formal record appears as to acceptance by the political [sub]division" qualifies the immediately preceding phrase "offered for dedication to such use." However, the more remote phrase "dedicated to the public use" is not qualified in any manner by the "no formal record" language. Section 2 addresses three distinct categories: (1) property that is donated to a political subdivision, (2) property for which dedication to a public use is complete, *i.e.,* evidenced by a formal acceptance of an offer of dedication, and (3) property offered for dedication where no formal record exists as to acceptance.

The City also argues that the trial court erred by refusing to apply the Act where statutory relief was available and requested and instead relying upon the common law public trust doctrine. It quotes 1 Pa. C.S. § 1504:

In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

Further, it has been held that where a remedy is provided by statute, the directions of the legislation must be strictly pursued, and the remedy is exclusive.[6]

---

5. The Court's review is limited to determining whether the record is free from legal error and whether the orphans' court's findings of fact are supported by the evidence. *In Re Estate of Berry,* 921 A.2d 1261 (Pa.Cmwlth.), *appeal denied,* 594 Pa. 700, 934 A.2d 1279 (2007).

6. The trial court lists this point as among the matters it deems waived by the City, citing Pa. R.A.P. 302(a), which provides: "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." In this case the "issue" is whether the Act applies to this dispute. The City's invoking the preference for statutory remedies is an argument in support of its position but not a separate issue in the case. In any event, the City proceeded under the Act, and a claim

*Lurie v. Republican Alliance,* 412 Pa. 61, 192 A.2d 367 (1963). The City concedes that there is no factual dispute that Erie Golf Course was dedicated to public use, but it contends that this case is distinguishable from *Trustees of Philadelphia Museums* inasmuch as in 1915 there was no statute permitting alternative disposition.

The City points out that two cases decided after *Bangor II* support the City's position that the Act applies even when there is a formal dedication. In *White* a township permitted erection of a communications tower on property expressly dedicated to use as a public park. The Court held that if the township decided that the dedication of the .428 acres that was leased for the tower no longer served the public interest, it had the recourse of an application under Section 4 of the Act and that in the absence of such an application the residents were permitted to proceed in equity.[7] In *Westmont* this Court approved an orphans' court's removal of a deed restriction on land and buildings conveyed by a steel corporation to a borough for municipal purposes only, after the borough moved its municipal building to a new location. The Court stated that Section 4 granted the orphans' court power to remove a restrictive covenant; otherwise, the power to approve a sale under Section 4(3) where the use of the property "is no longer practicable or possible or in the public interest" would be rendered nugatory.

Intervenors maintain that the trial court was bound to determine that the Act did not apply on the basis of *Bangor II*, where this Court expressly adopted the ruling of the trial court that it was obvious that the language of Section 2 of the Act meant that the Act applies only when there is no formal record as to acceptance. They argue that if ambiguity is found then the presumptions in 1 Pa.C.S. § 1922 provide guidance, including, *inter alia,* that the legislature does not intend an absurd result and that it favors public interests over any private interests. They contend that under 1 Pa.C.S. § 1924 the title and preamble of a statute may be considered in its construction and that the title of the Act more clearly shows intent to address only the situation where there is no formal record of acceptance. They do not separately address preference for a statutory remedy.

### III

◾ The City provides the correct application of the rules of construction and interpretation in the context of the entire Act. Section 2 is one sentence, and after the phrase in dispute it contains the words "regardless of whether *such dedication* occurred before or after the creation or incorporation of the political subdivision," thereby indicating an actual dedication. Section 3 commands that lands and buildings held by a political subdivision as trustee "shall be used for the purposes for which they were originally dedicated or donated," except as modified by court or-

that a statutory remedy is preferred was implicit all along.

7. In *Vutnoski,* published after briefs were filed in this case, the Court relied on *Bangor II* and quoted the rationale of *Bangor I.* It affirmed dismissal of the resident/taxpayers' complaint in equity averring, *inter alia,* that the redevelopment authority's proposed conveyance of a

sports complex recreational facility violated the Act. The residents argued that *White* supported the position that the Act applied even where property had been formally dedicated. Although acknowledging conflict with *White* this Court simply concluded that the language in *White* was obiter dictum on applicability of the Act where there was formal dedication.

der pursuant to the Act, again referring to an actual dedication.

Section 4 first creates a disjunction between when, in the opinion of the political subdivision as trustee, continuation of the original use of the property held in trust is no longer practicable or possible and has ceased to serve the public interest *"or"* where the political subdivision is in doubt as to the effectiveness or validity of an apparent dedication because of the lack of a record of acceptance. The lack of a record of acceptance plainly has no application to the first portion. Section 4 lists four types of relief that an orphans' court may permit but only one, Section 4(4), specifically refers to waiving rights "to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record. . . ." Section 4(3) permits the property or proceeds of its sale to be applied to another public use "[i]n the event the original trust purpose is no longer practicable or possible or in the public interest" and mirrors the first portion of Section 4 and does not turn on lack of a record of acceptance. Finally, if the legislature intended for the Act to apply only where there is no formal record of acceptance of an offer of dedication, it had only to list formal acceptance among the circumstances specifically excluded from the reach of the Act in Section 6, 53 P.S. § 3386.

The title of the Act shows an intent to apply to properties donated as public parks, squares or similar uses, to properties otherwise dedicated as public parks, squares or similar uses and to properties "offered for dedication, where no formal record appears as to acceptance by the political subdivision, as public parks, squares or similar uses. . . ." Indeed, but for the comma between "offered for dedication" and "where no formal record appears" the restrictive application of the

qualifying language would be readily apparent. Another rule of construction states, however: "In no case shall the punctuation of a statute control or affect the intention of the General Assembly in the enactment thereof but punctuation may be used to aid in the construction thereof if the statute was finally enacted after December 31, 1964." 1 Pa.C.S. § 1923(b).

▪ The City is correct that the trial court erred in applying the common law public trust doctrine when the statutory relief found in the Act applies. Giving the terms of Section 2 of the Act the meaning dictated by the context in which they are used, *Philadelphia Housing Authority v. Pennsylvania Labor Relations Board,* 508 Pa. 576, 499 A.2d 294 (1985), and applying the qualifying language of "where no formal record appears as to acceptance by the political [sub]division" to the immediately preceding words but not to those more remote, *Packer,* the Court holds that the Act applies when there is a formal record of acceptance and dedication of donated property. The Court therefore overrules contrary holdings in *Bangor II* and *Vutnoski.*

▪ The City next argues that the trial court erred by using an incorrect standard of review to assess the City's evidence in support of its petition. Although the trial court held that the Act did not apply, it nonetheless performed an analysis assuming *arguendo* that it did. The trial court stated that the only reason offered by the City in support of its contention that the original purpose was no longer practicable and had ceased to serve the public interest was that the debt service on the loan had rendered Erie Golf Course too expensive to keep and maintain. In its second opinion the trial court indicated that it did not disregard the City's evidence of financial problems, as contended on appeal.

The City emphasizes the provision in Section 4 of the Act: *"When, in the opinion of the political subdivision which is the trustee,* the continuation of the original use ... is no longer practicable or possible and has ceased to serve the public interest" the trustee may apply to the court for relief. The statute therefore requires deference to the municipality's opinion. In *Goodman Appeal,* 425 Pa. 23, 30, 227 A.2d 816, 820 (1967) (quoting *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 573, 109 A.2d 331, 335 (1954)), the Supreme Court stated that a host of authorities had established the following:

"[C]ourts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution.... That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion[.]"

*See also Weber v. Philadelphia,* 437 Pa. 179, 262 A.2d 297 (1970), noting that a presumption exists that municipal officers act for the public good, that courts may not inquire into the wisdom of municipal acts absent evidence of fraud, collusion, bad faith or arbitrary action constituting abuse of power, that judicial discretion should not be substituted for administrative discretion and that courts are not super municipal bodies and should not interfere absent improper motivation of record.

The Court agrees with the City that neither its witnesses nor those of Intervenors offered any evidence to support a determination that the City's actions fell outside the scope of its discretionary authority. The trial court plainly did not agree with the City's decision to sell the Erie Golf Course or with all of the elements that went into formulating that decision, but nowhere in its findings is there any basis for concluding that City officials acted with bad faith, fraud, arbitrary or capricious conduct or abuse of power. As a result, the trial court erred by failing to apply the required limited review in this matter.

■ In a closely related argument the City's maintains that the trial court misinterpreted the phrase "no longer practicable or possible" to limit it to physical practicability or possibility, and it also failed to determine that the City presented sufficient evidence. Section 4 twice refers to the phrase "no longer practicable or possible" with regard to the original purpose. Courts may consult dictionaries for the common and approved usage of terms not defined in statutes. *Philadelphia Eagles Football Club, Inc. v. City of Philadelphia,* 573 Pa. 189, 823 A.2d 108 (2003). The word "practicable" is defined in Webster's Third New International Dictionary 1789 (2002) as "1: possible to practice or perform : capable of being put into practice, done or accomplished: Feasible...." The City's view is that its common usage is broad enough to encompass fiscal or economic impracticability.

Evidence of the continuing need to cover losses with general fund revenues supports the City's position that the golf course use of the property is no longer practicable. Appraiser James Powers, Assistant Director of Public Works David Mulvihill and Mayor Sinnott testified that the golf course consistently lost money. Powers believed that the course could never sustain itself because there was too much competition in the Erie market. The Mayor and Mulvihill testified that the general

fund had to loan money to the golf operations. The Mayor and accountant Paparone testified that the City accrued a $12,000,000 deficit over the past three years, and the Mayor indicated that the money diverted from the general fund affected core services such as public safety and public works.

The trial court merely noted that the origin and accuracy of the City's financial data was "contested" and then found that financial evidence alone did not clearly demonstrate that use of Erie Golf Course is no longer practicable. The trial court concluded that Erie Golf Course "does not need to generate any specific amount of income to be a viable asset to the public[,]" *see* June 27, 2007 Opinion, p. 13. It adopted the policy that a municipal fiduciary should not be permitted to create a problem that serves as its only justification for overturning a deed restriction because any municipality wishing to sell donated property could simply accept a loan on unreasonable terms and claim that it was too expensive to repay.

The fallacy of this reasoning is that the speculated scenario turns on bad-faith conduct by a municipality. As noted above, courts may and should intervene when bad faith or fraud is shown; otherwise, they should not. *Weber*; *Goodman Appeal.* In this case, the trial court disagreed with the policy decisions made by the City, but the trial court did not find fraud, bad faith, capriciousness or abuse of power. Based on its review, the Court holds that the trial court erred in determining that the Act did not apply and further that the trial court erred in the manner in which it applied the Act assuming *arguendo* that it did apply. Because of this error, the Court is compelled to reverse the trial court's order denying the City's petition on the basis that the Act did not apply, and it remands this matter to the trial court for proper

consideration of the City's petition applying the Act and for evaluation of the evidence presented under Section 4 with due deference to the actions of municipal officials acting within their discretionary powers.

### ORDER

AND NOW, this 7th day of January, 2009, this Court reverses the order of the Court of Common Pleas of Erie County denying the City of Erie's petition to abandon the use of dedicated public property, and this matter is remanded to the trial court for consideration of the petition in a manner consistent with the foregoing opinion.

Jurisdiction is relinquished.

### DISSENTING OPINION BY Judge PELLEGRINI.

Because I disagree with the majority that the public property at issue was donated, I respectfully dissent.

In 1926, the Erie Golf Club conveyed its property to the City of Erie for $1 and its assumption of a $15,000 mortgage. Erie City Council enacted an ordinance authorizing the purchase, and the deed transferring the property was recorded, which included a deed restriction requiring the City to keep and maintain the property as a golf course or a public park. Since 1926, the property has been used as a golf course. The City, because of its fiscal condition, now desires to sell the property.

The City filed a petition to abandon the use of the golf course as a dedicated property under the Donated or Dedicated Property Act (Act), Act of December 15, 1959, P.L. 1772, 53 P.S. §§ 3381–3386. The trial court granted leave to intervene to the Lake Erie Region Conservancy which argued that the common law public trust principles applied. The trial court

agreed with intervenors and denied the City's petition.

On appeal to this Court, the majority reverses the trial court and relies on the Act to conclude that the City was entitled to abandon the golf course. In doing so, it relies on Section 2 of the Act, 53 P.S. § 3382, which provides:

All lands or buildings heretofore or hereafter *donated to* a political subdivision for use as a public facility, or *dedicated to* the public use or *offered for dedication* to such use, where no formal record appears as to acceptance by the political division, as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee. (Emphasis added.)

In doing so, the majority focuses on the fact that despite no formal record, the property was dedicated. It then looks at Section 4 of the Act, 53 P.S. § 3384, which provides relief that an orphans' court may allow; specifically, Section 4(4) provides that waiving rights "to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record ..." Further, Section 4(3) provides that "in the event the original trust purpose is no longer practicable or possible or in the public interest," the property or the proceeds from its sale may be applied to a different public purpose. Determining that it is no longer practicable or possible to maintain the golf course financially, the majority reverses the trial court's order. I disagree with the majority because the golf course property was not "donated" but instead was purchased, and, therefore, the Act has no relevance in this decision.

The Act itself does not define the terms "donate" or "dedicate." However, the dictionary defines "donate" as "to make a gift of; to contribute to a public or charitable cause." Webster's Ninth New Collegiate Dictionary 375 (1989). Dedication is defined as "to open for public use." *Id.* at 332. In this case, when the golf course property was conveyed to the City in 1926, the City *purchased* it for $1.00. It was not "donated" as a gift, and there was never any document dedicating the property to the City and its residents for a public use. Instead, the City assumed the debt that was outstanding on the property at that time—a $15,000 mortgage in 1926—and continued until the present to have to make maintenance payments on the property to the point that it could no longer afford to do so.

Because the property was not donated, the Act is irrelevant and the majority should not have applied it to this case. For this reason, I would vacate the trial court's decision because it has no jurisdiction to authorize or deny the sale under the Act. If the City wants to sell the property, it has to do so in accordance with the process of selling City land with a deed restriction.

President Judge LEADBETTER and Judge McGINLEY join.