**In Re: ESTATE OF RYERSS, Deceased**

**Appeal of: Fox Chase Cancer Center**

**In Re: Estate of Robert W. Ryerss, Deceased**

**Appeal of City of: Philadelphia.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 14, 2009.
Decided Dec. 16, 2009.
Reargument Denied Feb. 22, 2010.

James G. Colins, Philadelphia, for appellant, Fox Chase Cancer Center.

Elise Bruhl, Philadelphia, for appellee, City of Philadelphia.

Samuel C. Stretton, West Chester, for appellees, Jean Gavin, Fred Maurer, Tim Kearney, Janice Nevin, Mary Tracy, Margaret Dietrich, Sharon Doyle, Wanda Exline, Jay Cooke and Kate Friend.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

The City of Philadelphia (City) and Fox Chase Cancer Center (Fox Chase) (together, Appellants) appeal from the order of the Orphans' Court Division of the Philadelphia Court of Common Pleas (orphans' court), which denied their Petition for Authorization to Lease Real Property (Petition). Through the Petition, Appellants sought authorization for the City to discontinue using 19.4 acres (the Property) of Burholme Park (the Park) as parkland and to lease it to Fox Chase for the expansion of its facilities. In denying the Petition, the orphans' court declined to apply the act commonly known as the Donated or Dedicated Property Act (DDPA)[1] and, instead, applied the public trust doctrine and the act commonly known as the Inalienable Property Act.[2] On appeal, Appellants argue that the orphans' court erred by failing to grant their Petition under the DDPA. Alternatively, Appellants argue that even if the Inalienable Property Act is the more applicable statute, the orphans' court erred in failing to grant their Petition under that statute.

## I. Facts and Procedural Posture

### A. The Park

The Park consists of approximately 65 acres of land located in a densely populated residential area of Northeast Philadelphia. (Orphans' Ct. Op. at 1, 8.)[3] The

---

1. Act of December 15, 1959, P.L. 1772, 53 P.S. §§ 3381–3386.

2. 20 Pa.C.S. §§ 8301–8306.

3. All references to the orphans' court's opinion are to the opinion dated December 9, 2008.

Park is part of the City's Fairmount Park system and, as such, is managed and maintained by the Fairmount Park Commission (Commission). (Orphans' Ct. Op. at 8.) The Park offers numerous attractions, including a museum, athletic fields, picnic areas, a playground, walking trails, a miniature golf course, a golf driving range, and batting cages. (Orphans' Ct. Op. at 9.) The Park also offers visitors a view of the Center City skyline near the Ryerss Mansion. (Orphans' Ct. Op. at 9.) The Park is actively used by the public and by many schools and local youth organizations. (Orphans' Ct. Op. at 9.)

Most of the land that comprises the Park consists of property (including a portion of a farm and a house) which was devised to the City by Robert W. Ryerss in a will dated June 25, 1889. (Orphans' Ct. Op. at 5.) The will directed that the land should be used "as a Public Park ... to be called 'Burholme Park'" and that it is "to be for the use and enjoyment of the people forever." (Ryerss' Will at 3–4, Appellants' Ex. 1; R.R. Vol. 2 at 1092a–93a.) The will also directed that the house should be "used as a Library and Museum Free to the Public." (Ryerss' Will at 4; R.R. Vol. 2 at 1093a.) The will further directed that, upon Ryerss' death, both the land and the house were to pass to Ryerss' widow to be used by her during her lifetime, before passing to the City.[4] (Ryerss' Will at 1, 3; R.R. Vol. 2 at 1090a, 1092a.) Additionally, Ryerss provided a monetary endowment to the City for the purpose of maintaining the Park and the Library/Museum. (Ryerss' Will at 4; R.R. Vol. 2 at 1093a.) After Ryerss' death, his widow, Mary A. Ryerss Bawn, donated her life estate in the land and the house to the City and asked the City to take possession of the same. (Orphans' Ct. Op. at 6.) On July 27, 1905, the City enacted an ordinance officially accepting Ryerss' devise of, and Ryerss Bawn's conveyance of her life estate in, the land and the house. (Orphans' Ct. Op. at 6.) The ordinance specifically incorporated the language from Ryerss' will indicating that the donated land "be used as a park," that it "be called 'Burholme Park,'" and that it "be free for the use and enjoyment of the people forever." (July 27, 1905 Ordinance at 181; R.R. Vol. 2 at 1101a.) Subsequently, by ordinance dated July 16, 1915, the City designated additional land, comprising approximately 21 acres, to be made part of the Park. (Orphans' Ct. Op. at 7.)

The orphans' court found that Ryerss' endowment worth over $1,250,000, as well as taxpayer funds and revenue, have been used to care for and maintain the Park. (Orphans' Ct. Op. at 10.)

### B. Fox Chase

Fox Chase is a top-ranked, "comprehensive cancer center engaged in basic science, clinical trial research, translational research and the development of new therapies to offer patients a variety of treatment options." (Orphans' Ct. Op. at 10.) Fox Chase currently has a seventeen-acre campus located "in Northeast Philadelphia, directly north of [the] Park." (Orphans' Ct. Op. at 10.) Fox Chase has operated at that location since 1949. (Orphans' Ct. Op. at 10.) In 2002, Fox Chase "began focusing on long-term planning to meet future patient needs and to assure that the center could maintain its role as an outstanding comprehensive cancer center." (Orphans' Ct. Op. at 11.) Fox Chase determined that it was necessary to expand the size of its campus and expressed a desire to do so at its current site. (Orphans' Ct. Op. at 12.) Fox Chase prefers to have its research and treatment work occur at one

---

**4.** Ryerss' will did not create a remainder interest in any other individuals or entities and did not create a reversionary interest in Ryerss' heirs.

location. (Orphans' Ct. Op. at 12–13.) Fox Chase believes that this unified campus approach, which allows for more interaction between scientists, researchers, and trialists, is vital to its continuing success in the future. (Orphans' Ct. Op. at 12–13.) Fox Chase does not own sufficient land at its current site to expand its facilities. (Orphans' Ct. Op. at 12–13.) Therefore, in order to be able to expand its facilities at its current site, Fox Chase would need to purchase or lease adjacent land.

### C. Agreement to Lease 19.4 Acres of the Park to Fox Chase

In 2004, Fox Chase "approached the … Commission with the possibility of [purchasing and] expanding into 39 acres of [the] Park." (Orphans' Ct. Op. at 13.) The Commission rejected Fox Chase's initial proposal. (Orphans' Ct. Op. at 13.) However, following negotiations, the parties proposed that Fox Chase could expand into the Property in five phases and that Fox Chase could lease, rather than buy, the Property from the City. (Orphans' Ct. Op. at 15–16.)

Under the terms of the Ground Sub-sublease,[5] Fox Chase agreed to pay $8.25 million to the Fairmount Park Conservancy (Conservancy). (Articles 1.7.2.2 and 3.1 of the Ground Sub-sublease, Appellants' Ex. 13C; R.R. Vol. 2 at 1176a–77a, 1181a–82a.) Of that amount, $1.25 million is to be used for maintaining and improving the Park. (Article 3.5 of the Ground Sub-sublease; R.R. Vol. 2 at 1182a.) The parties also agreed that, in lieu of finding replacement land,[6] Fox Chase would pay an additional $4 million "to the City for deposit in an account dedicated to 'Improvements to Existing Facilities' in the 10th City Council District, with first priority given to park land and open space, otherwise for other public purposes ('ITEF Funds')." (Article 26.1 of the Ground Sub-sublease; R.R. Vol. 2 at 1216a.) Fox Chase also agreed to pay $500,000 to the Conservancy as additional consideration. (Article 26.1 of the Ground Sub-sublease; R.R. Vol. 2 at 1216a.) The lease period of the Ground Sub-sublease is 80 years, with options to renew for two additional 40–year periods. (Articles 2.1.2 and 2.2.1 of the Ground Sub-sublease; R.R. Vol. 2 at 1179a–80a.)

Fox Chase contemplates constructing as many as 18 buildings, which will be between four and nine occupied stories, on the Property. (Orphans' Ct. Op. at 1, 25–26.) Construction of these buildings would consume the northern and western wooded areas of the Park and, ultimately, the golf driving range. (Orphans' Ct. Op. at 25.)

On March 6, 2008, the City Council voted to approve a bill that would authorize the lease of the Property as described above. (Orphans' Ct. Op. at 20.) Mayor Michael A. Nutter signed the bill into law on March 12, 2008 (March 12, 2008 Ordi-

---

**5.** The Ground Sub-sublease is part of a series of agreements necessary to accomplish the proposed transaction in this case. The City, as the landlord, acting through the Commission, entered into a Master Ground Lease with the Philadelphia Authority for Industrial Development (PAID), as tenant and sublandlord. (Master Ground Lease at 1, Appellants' Ex. 13A; R.R. Vol. 2 at 1119a.) As the sublandlord, PAID entered into a Ground Sublease with Fairmount Park Conservancy (Conservancy), a nonprofit organization that raises funds for and awareness about the Fairmount Park system, as the subtenant and sub-sub-

landlord. (Ground Sublease at 1, Appellants' Ex. 13B; R.R. Vol. 2 at 1147a.) The Conservancy, as the sub-sublandlord, would then, in turn, enter into the Ground Sub-sublease with Fox Chase as the sub-subtenant. (Ground Sub-sublease at 1, Appellants' Ex. 13C; R.R. Vol. 2 at 1171a.)

**6.** The parties originally intended that additional land would be located to replace any parkland that would be used in the Fox Chase expansion; however, no replacement land could be located that was suitable to all of the parties involved. (Orphans' Ct. Op. at 20.)

nance). (Orphans' Court Op. at 20.) In the March 12, 2008 Ordinance, the City concluded that "it is no longer practicable or possible" and "will not serve the public interest" to continue using the Property as parkland. (March 12, 2008 Ordinance, Section 1(J), Appellants' Ex. 16; R.R. Vol. 3 at 1321a.) In reaching this conclusion, the City reasoned that continuing to use the Property as parkland "would preclude Fox Chase from expanding its campus and will likely compel Fox Chase to relocate its existing campus and future facilities outside the City." (March 12, 2008 Ordinance, Section 1(J); R.R. Vol. 3 at 1321a.) The City further reasoned that this, in turn, would cause the City's citizens to lose thousands of jobs, would be harmful to the City's tax base, and would result in the City losing a top-ranked cancer center. (March 12, 2008 Ordinance, Section 1(F)-(G); R.R. Vol. 3 at 1321a.)

### D. Petition to the Orphans' Court

On May 23, 2008, the City filed the Petition with the orphans' court, seeking authorization to lease the Property via the Ground Sub-sublease between Fox Chase and the Conservancy. Fox Chase joined in the Petition. Appellants sought relief under the Inalienable Property Act or un-

der "any other applicable law." (Petition at V; R.R. Vol. 1 at 65a.) In response, two organizations, the Society Created to Reduce Urban Blight (SCRUB) and Save Burholme Park, as well as thirteen individuals consisting of taxpayers, non-taxpayers, and Ryerss' heirs, filed petitions to intervene. The orphans' court denied intervenor status to the two organizations, the Ryerss' heirs, and the non-taxpayers. However, by order dated August 25, 2008, the orphans' court granted the petition to intervene filed by the individual taxpayers (Appellees).[7] The orphans' court subsequently held several days of hearings on the matter, beginning on August 28, 2008. The orphans' court also held oral argument after the parties submitted post-hearing briefs.

■■■ On December 9, 2008, the orphans' court issued an opinion and order denying the Petition. The orphans' court based its decision, in large part, on the common law public trust doctrine.[8] It also rejected the City's request to allow it to lease the Property pursuant to the Inalienable Property Act. In doing so, the orphans' court noted that the Inalienable Property Act does not contain a standard of review. While Appellants cited to the DDPA, among other sources, as setting

---

7. Fox Chase, in its Brief Statement of Issues Presented for Review filed with this Court on March 2, 2009, raised an issue regarding the orphans' court granting Appellees standing. However, Fox Chase did not include this issue in the Statement of Questions Involved section of its brief, nor did it otherwise develop this issue anywhere else in its brief. Accordingly, any challenge to Appellees' standing has been waived. *See* Pa. R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"); *G.M. v. Department of Public Welfare*, 954 A.2d 91, 93 (Pa.Cmwlth.2008) (holding that issues not included in the statement of questions involved are waived); *Rapid Pallet v. Unemployment Compensation Board of Review*, 707 A.2d 636, 638 (Pa.Cmwlth.1998)

(stating that, pursuant to Pa. R.A.P. 2119(a), "[a]rguments not properly developed in a brief will be deemed waived by this Court"). We also note that Fox Chase's Notice of Appeal refers only to the December 9, 2008 order denying the Petition, and not the orphans' court's August 25, 2008 order granting taxpayers standing.

8. Under the common law public trust doctrine, when land has been dedicated and accepted for public use, a political subdivision is estopped from interfering with or revoking the grant at least so long as the land continues to be used, in good faith, for the purpose for which it was originally dedicated. *Board of Trustees of Philadelphia Museums v. Trustees of the University of Pennsylvania*, 251 Pa. 115, 123–25, 96 A. 123, 125–26 (1915).

forth the appropriate standard of review, the orphans' court declined to apply the DDPA. The orphans' court stated that the DDPA is inapplicable because, according to *Vutnoski v. Redevelopment Authority of Scranton*, 941 A.2d 54 (Pa.Cmwlth.2006), *overruled by In Re Erie Golf Course*, 963 A.2d 605 (Pa.Cmwlth.), *appeal granted*, 601 Pa. 92, 971 A.2d 490 (2009), the DDPA only applies where there is no formal record of acceptance of donated land, and here there is a formal record of acceptance.[9] Ultimately, the orphans' court relied most heavily on Section 7740.3(a) of the Probate, Estates, and Fiduciaries Code (PEF), 20 Pa.C.S. § 7740.3(a),[10] dealing with charitable trusts, and the public trust doctrine for the appropriate standard of review. The orphans' court stated that both Section 7740.3 and the cases interpreting the public trust doctrine "focus[ ] on the purpose of the charitable trust and whether that purpose is still viable." (Orphans' Ct. Op. at 40.) It also stated that, if the purpose of the trust is no longer viable, Section 7740.3 of the PEF "provides a standard based on a cy pres [11] analysis to fulfill as nearly as possible the charitable intent of the settlor." (Orphans' Ct. Op. at 40 (footnote added).) The orphans' court determined that Appellants

failed to present any evidence to establish that the originally intended use of the Property as parkland is no longer viable. The orphans' court also determined that the proposed use of the Property is inconsistent with the trust purpose. Appellants filed separate appeals of the orphans' court's order.[12]

## II. Discussion

On appeal, Appellants argue that the DDPA is applicable to the instant matter after this Court's recent decision in *Erie Golf Course*. Appellants further argue that, if this Court applies the DDPA as it was applied in *Erie Golf Course*, we will need to give deference to the opinion of the City and uphold the City's determination that use of the Property as parkland is no longer practicable and has ceased to serve the public interest. Appellants also argue that even if the Inalienable Property Act, and not the DDPA, applies in this case, they are entitled to relief under that act. We will address Appellants' arguments, in turn, below.

### A. Applicability of the DDPA to this case

 Appellants first argue that the DDPA is applicable to the instant matter

---

**9.** Although not specifically stated by the orphans' court, this reasoning also appears to explain why the orphans' court did not consider whether Appellants were entitled to relief under the DDPA by itself, without regard to the Inalienable Property Act.

**10.** Section 7740.3 provides, in relevant part:
　(a) General Rule.—Except as otherwise provided in subsection (b), if a particular charitable purpose becomes unlawful, impracticable or wasteful:
　(1) the trust does not fail, in whole or in part;
　(2) the trust property does not revert to the settlor or the settlor's successors in interest; and
　(3) the court shall apply cy pres to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific.

20　Pa.C.S. § 7740.3(a).

**11.** The term "cy pres" is defined as "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." Black's Law Dictionary 392 (7th ed.1999).

**12.** "On appeal from an order of the orphans' court, this Court's scope of review is limited to determining whether the record is free from legal error and whether the court's factual findings are supported by the evidence." *In Re Estate of Berry*, 921 A.2d 1261, 1263 n. 1 (Pa.Cmwlth.2007).

in accordance with this Court's recent decision in *Erie Golf Course*.[13] We agree.

The threshold issue in *Erie Golf Course* was whether the DDPA applied only when there is no formal record of acceptance by a political subdivision or whether it could apply where there is a formal record of acceptance and dedication of property. In that case, it was clear that the City of Erie had formally accepted the property, which was a golf course. The City of Erie filed a petition to abandon the use of the golf course pursuant to the DDPA, which the trial court denied, concluding that the DDPA did not apply where there was a formal acceptance. In reaching this conclusion, the trial court relied on Section 2 of the DDPA, 53 P.S. § 3382, which provides:

> All lands or buildings heretofore or hereafter donated to a political subdivision for use as a public facility, or dedicated to the public use or offered for dedication to such use, *where no formal record appears as to acceptance by the political division,* as a public facility and situate within the bounds of a political subdivision, regardless of whether such dedication occurred before or after the creation or incorporation of the political subdivision, shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.

53 P.S. § 3382 (emphasis added). The trial court explained that the language in Section 2 that states, "where no formal record appears as to acceptance by the political subdivision," provides an express indication that the DDPA only applies where there is no formal record of acceptance.

On appeal, this Court acknowledged that there had been "inconsistencies" in previous cases, and that *Vutnoski* and *In re Bangor Memorial Park*, 130 Pa.Cmwlth. 143, 567 A.2d 750 (1989) (*Bangor II*), had "adopt[ed] the view that the [DDPA] applies only when there is no formal record of acceptance," while *White v. Township of Upper St. Clair*, 799 A.2d 188 (Pa.Cmwlth. 2002), and *Petition of Borough of Westmont*, 131 Pa.Cmwlth. 530, 570 A.2d 1382 (1990), had "assum[ed] that the [DDPA] applies in circumstances where there is a formal record of acceptance." *Erie Golf Course*, 963 A.2d at 606. Nonetheless, this Court determined that the DDPA does apply where there is a formal record of acceptance, and we overruled *Vutnoski* and *Bangor II*. *Erie Golf Course*, 963 A.2d at 612. In doing so, this Court examined the context in which the language that the trial court relied upon from Section 2 was used, explaining that:

> Section 2 is one sentence, and after the phrase in dispute it contains the words "regardless of whether *such dedication* occurred before or after the creation or incorporation of the political subdivision," thereby indicating an actual dedication. Section 3 [of the DDPA, 53 P.S. § 3383,[14]] commands that lands and

---

**13.** Appellees argue that Appellants waived this issue by failing to raise and preserve it below. Although the present matter was already decided by the orphans' court and pending before us on appeal at the time this Court issued its decision in *Erie Golf Course*, Appellants contend that they initially preserved the issue of the applicability of the DDPA by indicating in the Petition that they were seeking relief under the Inalienable Property Act or "any other applicable law." (Petition at V; R.R. Vol. 1 at 65a.) Appellants further contend that they specifically sought

relief under the DDPA in their joint posthearing briefs. We agree that Appellants adequately raised this issue below and preserved it for our review.

**14.** Section 3 provides that: "All such lands and buildings held by a political subdivision, as trustee, shall be used for the purpose or purposes for which they were originally dedicated or donated, except insofar as modified by court order pursuant to this act." 53 P.S. § 3383.

buildings held by a political subdivision as trustee "shall be used for the purposes for which they were originally dedicated or donated," except as modified by court order pursuant to the [DDPA], again referring to an actual dedication.

Section 4 [of the DDPA, 53 P.S. § 3384,[15]] first creates a disjunction between when, in the opinion of the political subdivision as trustee, continuation of the original use of the property held in trust is no longer practicable or possible and has ceased to serve the public interest *"or "* where the political subdivision is in doubt as to the effectiveness or validity of an apparent dedication because of the lack of a record of acceptance. The lack of a record of acceptance plainly has no application to the first portion. Section 4 lists four types of relief that an orphans' court may permit but only one, *Section 4(4)*, specifically refers to waiving rights "to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record...." *Sec-*

*tion 4(3)* permits the property or proceeds of its sale to be applied to another public use "[i]n the event the original trust purpose is no longer practicable or possible or in the public interest" and mirrors the first portion of Section 4 and does not turn on lack of a record of acceptance. Finally, if the legislature intended for the [DDPA] to apply only where there is no formal record of acceptance of an offer of dedication, it had only to list formal acceptance among the circumstances specifically excluded from the reach of the [DDPA] in Section 6, 53 P.S. § 3386.[16]

*Erie Golf Course*, 963 A.2d at 611–12 (emphasis in the original) (footnotes added).

▋ In the case at bar, there is no question that there was a formal acceptance of the Park. Therefore, the DDPA would apply to this case, as long as *Erie Golf Course* can be applied to the present case, which was pending on appeal at the time that *Erie Golf Course* was decided. We have previously explained that where a decision "relies upon statutory interpreta-

---

15. Section 4 provides that:

When, in the opinion of the political subdivision which is the trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest, or where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication because of the lack of a record of the acceptance of the dedicated land or buildings, the trustee may apply to the orphans' court of the county in which it is located for appropriate relief. The court may permit the trustee to—

(1) Substitute other lands or property of at least equal size and value held or to be acquired by the political subdivision in exchange for the trust property in order to carry out the trust purposes.

(2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.

(3) In the event the original trust purpose is no longer practicable or possible or in the public interest, apply the property or the proceeds therefrom in the case of a sale to a different public purpose.

(4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land and buildings as have been apparently dedicated but for which no formal acceptance appears of record: Provided, only, That the court is satisfied upon hearing the evidence that there is no acceptance by implication arising out of public use[ ] or otherwise, the court shall also determine the consideration, if any, to be paid to the political subdivision.

53 P.S. § 3384.

16. Section 6 provides that: "Nothing in this act shall be construed to limit or affect the control by a political subdivision of public lands or buildings acquired by such political subdivision by purchase or condemnation." 53 P.S. § 3386.

tion, it relates back to the date the particular statute became effective, because it merely interprets existing legislation." *Waratuke v. Workmen's Compensation Appeal Board (Handee Marts),* 687 A.2d 1219, 1221 (Pa.Cmwlth.1997). This Court's decision in *Erie Golf Course* was based on its interpretation of the DDPA, which became effective in 1959. Because we were interpreting existing legislation in *Erie Golf Course,* our holding from that case relates back to the effective date of the DDPA and, thus, is applicable here.

### B. Entitlement to relief under the DDPA

Having determined that the DDPA is applicable to the present case pursuant to *Erie Golf Course,* we must now determine whether the City is entitled to relief under the DDPA. Appellants argue that, pursuant to *Erie Golf Course,* the orphans' court was required to give deference to the City's decision that the original use of the Property is no longer practicable or possible and has ceased to serve the public interest. Further relying on *Erie Golf Course,* Appellants contend that the orphans' court erred by failing to consider the economic impracticability of continuing to use the Property as parkland. According to Appellants, it would be economically impracticable to continue using the Property as parkland because Fox Chase would not be able to expand its facilities at its current site and would likely leave the City, which would, in turn, cause the loss of thousands of jobs, decrease the City's tax base, and result in the City losing a top-ranked cancer center.

Pursuant to Section 2 of the DDPA, because the Park was "donated to [the City] for use as a public facility, or dedicated to public use," it is "deemed to be held by [the City], as trustee, for the benefit of the public." 53 P.S. § 3382. As trustee, the City has a duty under Section 3 of the DDPA to ensure that the Park is "used for

the purpose or purposes for which [it was] originally dedicated or donated, except insofar as modified by court order." 53 P.S. § 3383; *see also White,* 799 A.2d at 198 (stating that Section 3 of the DDPA "creates a duty in the political division holding lands for use as [a] public facility"). It is Section 4 of the DDPA that provides a mechanism by which the City may terminate the dedicated use of the Park, "[w]hen, in the opinion of the political subdivision which is the trustee [the City], the continuation of the original use ... is no longer practicable or possible and has ceased to serve the public interest." ˙ 53 P.S. § 3384; *see also White,* 799 A.2d at 199 (stating that the DDPA "creates a mechanism by which political subdivisions may terminate a dedicated use of a public facility").

Appellants are correct that, in *Erie Golf Course,* this Court determined that the language in Section 4 of the DDPA, "[w]hen, in the opinion of the political subdivision which is the trustee," 53 P.S. § 3384, requires reviewing courts to give deference to the opinion of a political subdivision. *Erie Golf Course,* 963 A.2d at 613. In addition, this Court noted the standard from *Goodman Appeal,* 425 Pa. 23, 227 A.2d 816 (1967), that:

[C]ourts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution.... That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion.

*Erie Golf Course,* 963 A.2d at 613 (quoting *Goodman,* 425 Pa. at 30, 227 A.2d at 820) (emphasis omitted)).

 While we agree that, pursuant to *Erie Golf Course,* the decision of a political subdivision is entitled to considerable deference, political subdivisions do not have the authority to exceed what is permitted under the DDPA. Section 4 of the DDPA permits a political subdivision to apply to an orphans' court for relief from fulfilling its duty under Section 3 where, "in the opinion of the political subdivision . . ., the continuation of *the original use of the particular property* held in trust as a public facility *is no longer practicable or possible and has ceased to serve the public interest."* 53 P.S. § 3384 (emphasis added). Thus, based on this statutory language, in order to be relieved of its duty to hold the property as a trustee for the benefit of the public under Section 3, a political subdivision must establish that *the original use of the property* is: (1) no longer practicable or possible; *and* (2) has ceased to serve the public interest.[17]

 Here, Appellants did not meet either of these requirements. First, Appellants did not establish that the continued use of the Property as parkland is no longer practicable or possible. While the term "practicable" is not defined in the DDPA, this Court has previously relied on that term's common usage, explaining that "[t]he word 'practicable' is defined in Webster's Third New International Dictionary 1789 (2002) as '1: possible to practice or perform: capable of being put into prac-

tice, done or accomplished: FEASIBLE. . . ." *Erie Golf Course,* 963 A.2d at 613. This Court has also recognized that the term "practicable" is not limited to physical feasibility but, rather, also includes financial feasibility. *Id.* at 613–14. Appellants, here, do not really dispute that the City can physically and financially continue to maintain the Property as part of the Park. Instead of focusing on the practicability of the continued use of the Property as parkland, Appellants focus on the potential negative economic consequences if the Property cannot be used by Fox Chase. While we understand that Fox Chase's inability to expand at its present location may have negative economic consequences, this is not a consideration for which the DDPA allows the City to obtain relief from its duty to continue holding the Property in trust for its originally intended use as parkland.

Although Appellants rely on *Erie Golf Course* to support their argument regarding economic impracticability, we find that *Erie Golf Course* is factually distinguishable from the present case. In *Erie Golf Course,* we noted the presence of evidence indicating that the City of Erie continually needed to cover the operating losses of the golf course, which were "as high as $123,763" per year, from the city's general fund revenues. *Id.* at 609 n. 4. Specifically, we stated:

> Evidence of the continuing need to cover losses with general fund revenues supports the City's position that the golf

---

**17.** We note that underlying the arguments made in this case is a question as to the continuing viability of the public trust doctrine in light of the DDPA. We believe that the DDPA essentially incorporates the common law public trust doctrine by imposing a. duty on political subdivisions to ensure that donated or dedicated property held in trust is used for its originally intended purpose, but, at the same time, creates a mechanism by which a political subdivision may be relieved of that duty where the originally intended use of the property is no longer practicable or possible and has ceased to serve the public interest. We discern no intent on the part of the Legislature to allow a political subdivision to change the use of donated or dedicated property where the originally intended use of that property remains practicable or possible and continues to serve the public interest.

course use of the property is no longer practicable. Appraiser James Powers, Assistant Director of Public Works David Mulvihill and Mayor Sinnott testified that the golf course consistently lost money. Powers believed that the course could never sustain itself because there was too much competition in the Erie market. The Mayor and Mulvihill testified that the general fund had to loan money to the golf operations. The Mayor and accountant Paparone testified that the City accrued a $12,000,000 deficit over the past three years, and the Mayor indicated that the money diverted from the general fund affected core services such as public safety and public works.

*Id.* at 613–14. Unlike in *Erie Golf Course,* the record here does not support a finding that the continued operation of the Property as parkland is substantially draining the City's general fund revenues. Instead, the record establishes that the City is maintaining the Park, in large part, with income from the endowment that Ryerss left to the City for that purpose, and that there was still over $1 million in that trust account as of August 2008. (Orphans' Ct. Hr'g Tr. at 33, August 28, 2008, R.R. Vol. 1 at 203a; Orphans' Ct. Hr'g Tr. at 169, 211–12, September 12, 2008, R.R. Vol. 2 at 863a, 873a.) Although the City allocates taxpayer funding to maintain the Park, (Orphans' Ct. Hr'g Tr. at 83–84, October 2, 2008, R.R. Vol. 2 at 992a), the City has not established that allocating such funds is a *substantial* drain on the City. Moreover, there is no indication that the endowment is insufficient to maintain the Park if the City discontinued the allocation. Thus, the Park does not place the City in the same

type of financial predicament that was present in *Erie Golf Course.* Consequently, contrary to Appellants' argument, our decision in *Erie Golf Course* does not support awarding Appellants relief in this case.

■■■■■ Second, Appellants also did not establish that using the Property for its originally intended use as parkland has ceased serving the public interest. Instead, Appellants established their belief that continuing to use the Property as parkland is not *the most beneficial* use of the Property or the use which *best* serves the public interest. Certainly, the use of the Property for cancer research and treatment would greatly serve the public interest, as would the City's receipt of rental income. However, the statutory language focuses on whether the original use has "*ceased* to serve the public interest," 53 P.S. § 3384, not on whether another use would *better* serve the public interest. The Legislature did not draft the statute to allow for a balancing of benefits. If it did permit such balancing, every donated park in the Commonwealth would be at risk of being leased so that cash-strapped municipalities could balance their budgets. This would render the general duty imposed by Section 3 of the DDPA a nullity and likely discourage individuals from donating their property to be used for public purposes in the future. Here, Appellants do not dispute that the Property continues to be actively used by the public, that the Park remains a popular and important park in the system, and that the endowment in the trust account is sufficient to maintain the Park.[18] Because the City did not establish that the original use of the Property as parkland is no

---

**18.** While Appellants presented testimony indicating that "[t]here are major expenses" involved with maintaining the Park and that additional funds could be put towards *"better* maintenance of the [P]ark," (Orphans' Ct.

Hr'g Tr. at 33–34, August 28, 2008; R.R. Vol. 1 at 203a (emphasis added)), Appellants do not argue that the endowment in the trust account is insufficient to maintain the Park.

longer practicable or possible and that it has ceased to serve the public interest, Appellants are not entitled to relief under the DDPA.[19]

### III. Conclusion

We in no way question the importance of the contributions that Fox Chase makes to the City, the Commonwealth, and the general public. Furthermore, like the City, we hope that Fox Chase can find a way to expand its facilities such that it does not need to leave the City or the Commonwealth. However, under the DDPA,[20] we are constrained to conclude that Appellants are not entitled to the relief that they seek here. Accordingly, we affirm the order of the orphans' court on other grounds.

Judge BUTLER concurs in the result only.

### ORDER

NOW, December 16, 2009, the order of the Orphans' Court Division of the Philadelphia Court of Common Pleas in the above-captioned matter is hereby AFFIRMED on other grounds.

19. We note that Appellants seem to place importance on the fact that the City is seeking to lease, rather than sell, the Property. However, this distinction does not support awarding the City relief. Regardless of whether the City is leasing or selling the Property, Fox Chase plans to use such land for a use other than that which was specified by Mr. Ryerss when he donated the land to the City and for which the City dedicated the land. Additionally, Fox Chase's expansion plans involve construction of numerous buildings on the Property, which would substantially alter the current state of the land and would, thus, dispel any notion that the land may someday be easily put back to its originally intended use as parkland when the 80–year lease, with options to renew for two 40–year periods, has expired.

20. Given our determination that the DDPA is the appropriate statute to be applied in this case, we need not consider Appellants' alternative argument based on the Inalienable Property Act.