992 A.2d 75

In re ERIE GOLF COURSE.

Appeal of Lake Erie Region Conservancy, Inc., and Committee to Keep Erie Golf Course Open.

Supreme Court of Pennsylvania.

Argued Sept. 16, 2009.

Decided March 25, 2010.

Paul Franklin Curry, Richard E. Filippi, Richard E. Filippi and Associates, P.C., for Lake Erie Region Conservancy & Committee to Keep EGC Open.

Kimberly A. Hummel, PA Department of Conservation & Natural Resources, for amicus curiae Department of Conservation and Natural Resources.

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for amicus curiae Pennsylvania Land Trust Association.

Henry Fintan McHugh, Petrikin, Wellman, Damico, Brown & Petrosa, P.C., Media, for amicus curiae Stewart Hall, LP.

Gregory Alan Karle, Dailey, Karle & Villella, for City of Erie.

Patrick C. O'Donnell, West Chester, for amicus curiae Borough of Downingtown.

Jeffrey Concini Clark, Wix, Wenger & Weidner, P.C., Harrisburg, for amicus curiae Pennsylvania State Association of Township Supervisors.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice SAYLOR.

In this appeal, we consider whether the Donated or Dedicated Property Act applies to the sale of a municipal golf course and park.

In 1926, lands now known as the Erie Golf Course were conveyed to the City of Erie by a private club, on the municipality's payment of a nominal consideration of one dollar and assumption of a $15,000 mortgage. The recorded deed included a restrictive covenant, consistent with an authorizing ordinance, memorializing the City's commitment to preserve the property, indefinitely, as a golf course and/or for park purposes. The deed also formalized the parties' agreement that the restriction was to run with the land.

The City acted consistent with its covenant from 1926 until 2006. Indeed, in 2004, the governing body approved a multi-million dollar bond issue to perform improvements consistent with the original purposes. Shortly after the renovations, however—upon a change in City administration and in the face of economic challenges—the municipality permanently closed the golf course. Subsequently, the governing body authorized advertisements for sale of the property.

To support this course of action contrary to its recorded commitment, the City invoked the Donated or Dedicated Property Act.[1] In very general terms, and as relevant here, the enactment permits political entities to sell at least certain donated or dedicated property upon orphans' court approval, subject to conditions, where the original purposes are no longer practical and the property has ceased to serve the public interest. *See* 53 P.S. § 3384.

The City filed a petition seeking relief under the DDPA, and the orphans' court approved intervention by Appellants, Lake Region Conservancy and the Committee to Keep Erie Golf Course Open, which opposed a sale or other relief from the City's fiduciary responsibilities relative to the property. At the ensuing hearings, City witnesses testified that the golf course consistently operated at a net loss; losses would continue into the foreseeable future; the municipality had found it necessary to borrow from its general fund to maintain the golf course's operations; and it would likely have to continue to do so in the future to repay the multi-million dollar bond issue.

1. Act of Dec. 15, 1959, P.L. 1772 (as amended 53 P.S. §§ 3381–3386) (the "Act" or the "DDPA").

*See* N.T., Mar. 26, 2007, at 43, 49–52; N.T., Apr. 16, 2007, at 30–33. Ultimately, the orphans' court denied relief on the City's petition, determining that the property must remain in the public trust, and an appeal followed.

■ In its opinion under Rule of Appellate Procedure 1925(a), the orphans' court examined Section 2 of the Act, focusing, in particular, on the below-emphasized language:

All lands ... heretofore ... donated to a political subdivision for use as a public facility, or dedicated to the public use or offered for dedication to such use, *where no formal record appears as to acceptance by the political division,* ... shall be deemed to be held by such political subdivision, as trustee, for the benefit of the public with full legal title in the said trustee.

53 P.S. § 3382 (emphasis added). According to the court, the italicized term served to limit the application of the entire Act solely to circumstances in which no formal record of acceptance appears. Thus, the court rejected the City's contrary argument that the no-formal-acceptance proviso actually was intended to clarify that the DDPA applies, not only to fully-realized dedications, but also in circumstances where some degree of uncertainty might prevail concerning acceptance by a municipality.[2] The orphans' court found support for a restrictive construction of the DDPA's reach in a line of Commonwealth Court decisions. *See, e.g., Vutnoski v. Redevelopment Auth. of Scranton,* 941 A.2d 54, 58–59 (Pa.Cmwlth. 2006); *In re Conveyance of 1.2 Acres of Bangor Mem. Park to Bangor Area Sch. Dist.,* 130 Pa.Cmwlth. 143, 147–48, 567 A.2d 750, 753 (1989) (adopting, by incorporation, a narrow approach to the Act's scope).

The orphans' court elaborated that, under the common-law public trust doctrine, a political entity is prohibited from undermining the public's right of use of property after its dedication and acceptance. *See Bd. of Trs. of Phila. Museums v. Trs. of Univ. of Pa.,* 251 Pa. 115, 123–24, 96 A. 123, 125

**2.** Pursuant to the common law, a fully-realized dedication of property, like a contract, entails both an offer and an acceptance. *See In re Altoona,* 479 Pa. 252, 258, 388 A.2d 313, 315–16 (1978).

(1915); *City of Easton v. Koch,* 152 Pa.Super. 327, 339, 31 A.2d 747, 752 (1943). Here, the court reasoned that the Erie Golf Course was formally dedicated and accepted by the City for public enjoyment, evidenced by: the express language of the recorded deed; the ordinance accepting the dedication; the City's continuous and exclusive use of the property as a golf course for over eighty years; its contribution of funds toward the maintenance and improvement of the property consistent with the designated purposes; and the public's use of the property as such since 1926. Thus, the court determined that the public trust doctrine, and not the Act, controlled. Because the City held the property as a fiduciary for the benefit of the public, the court concluded that the municipality was prohibited from selling, conveying, or otherwise abandoning the specified uses, consistent with its recorded covenant.

The orphans' court also observed that—even assuming, *arguendo,* that the Act applied—the City's only support for its argument of impracticability rested on the debt service burden. The court was not convinced, however, by the City's financial evidence that the property no longer served the public interest, particularly as this evidence was substantially undermined upon adversarial testing. Likewise, the court indicated that the City failed to establish impracticability of the public-park use. Furthermore, the court found that the recent renovations substantially enhanced the viability of the existing uses.[3]

In light of a conflict in prior panel decisions,[4] the Commonwealth Court considered the City's appeal *en banc. See In re*

---

**3.** Parenthetically, the orphans' court also determined that a number of the City's arguments pertaining to statutory construction were unpreserved. Nevertheless, the Commonwealth Court reviewed those arguments on their terms, and the City's central position that the Act applies appears to encompass most of the subsidiary arguments concerning why that is so. In any event, we did not accept review on issue-preservation matters; Appellants do not argue waiver; and we are not of a mind to embark on an independent review.

**4.** The *Vutnoski/Bangor* line of decisions relied upon by the orphans' court is in tension with *White v. Twp. of Upper St. Clair,* 799 A.2d 188 (Pa.Cmwlth.2002), and *Petition of Borough of Westmont,* 131 Pa.

*Erie Golf Course,* 963 A.2d 605, 606 (Pa.Cmwlth.2009). In a divided opinion, the intermediate appellate court adopted the municipality's more expansive construction of the Act's scope and, accordingly, reversed the orphans' court's order. *See id.* at 612. In supportive reasoning, the majority implicitly deemed the statute ambiguous and invoked several tools of statutory construction. Primarily, the majority discerned the meaning of the controverted no-formal-acceptance proviso from the context surrounding its use. *See id.* (citing *Phila. Hous. Auth. v. PLRB,* 508 Pa. 576, 586, 499 A.2d 294, 299 (1985)). In this regard, the majority gleaned a legislative intent to address fully-realized dedications from the language of Section 2 following the no-formal-acceptance term,[5] as well as in other passages of the Act.[6] In particular, the majority referenced Section 4, which authorizes disposition of certain public trust property, in defined circumstances, as follows:

> When, in the opinion of the political subdivision which is the trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest, *or* where the political subdivision, as trustee for the benefit of the public, is in doubt as to the effectiveness or the validity of an apparent dedication *because of the lack of a record of the acceptance of the dedicated land* . . ., the trustee may apply to the orphans' court of the county in which it is located for appropriate relief. The court may permit the trustee to—

Cmwlth. 530, 570 A.2d 1382 (1990), where the Commonwealth Court appears to have contemplated application of the Act to fully realized dedications and declarations. *See White,* 799 A.2d at 200; *Westmont,* 131 Pa.Cmwlth. at 535–36, 570 A.2d at 1384–85.

5. *See id.* at 611 ("Section 2 is one sentence, and after the phrase in dispute it contains the words 'regardless of whether *such dedication* occurred before or after the creation or incorporation of the political subdivision,' thereby indicating an actual dedication." (emphasis in original)).

6. *See id.* at 611–12 ("Section 3 commands that lands . . . held by a political subdivision as trustee 'shall be used for the purposes for which they were originally dedicated or donated,' except as modified by court order pursuant to the Act, again referring to an actual dedication.").

(1) Substitute other lands ... in exchange for the trust property in order to carry out the trust purposes.

(2) If other property is not available, sell the property and apply the proceeds to carry out the trust purposes.

(3) In the event the original trust purpose is no longer practicable or possible or in the public interest, apply the property or the proceeds therefrom in the case of a sale to a different public purpose.

(4) Relinquish, waive or otherwise quitclaim all right and title of the public in and to such land ... as have been apparently dedicated *but for which no formal acceptance appears of record* ....

53 P.S. § 3384 (emphasis added).

Examining this passage, the majority emphasized the disjunctive "or" between the distinct provisions addressing a change in circumstances, on the one hand, and uncertainties associated with a lack of record acceptance, on the other. *See Erie Golf Course*, 963 A.2d at 612 (explaining that the "lack of a record of acceptance plainly has no application to the first portion."). Furthermore, the majority observed that Section 4 delineates multiple forms of relief, only the last of which redresses the no-formal-acceptance scenario. *See id.* (elaborating, for example, that "Section 4(3) permits the property or proceeds of [a] sale to be applied to another public use '[i]n the event the original trust purpose is no longer practicable or possible or in the public interest' and mirrors the first portion of Section 4 and does not turn on lack of a record of acceptance."). Moreover, the majority opined, "if the legislature intended for the Act to apply only where there is no formal record of acceptance of an offer of dedication, it had only to list formal acceptance among the circumstances specifically excluded from the reach of the Act in Section 6[.]" *Id.* (referencing 53 P.S. § 3386 ("Nothing in this act shall be construed to limit or affect the control by a political subdivision of public lands ... acquired by such political subdivision by purchase or condemnation.")).

The Commonwealth Court majority derived additional support from the title of the Act:

Providing for the orderly disposition of properties situate within political subdivisions and donated, or otherwise dedicated or offered for dedication, where no formal record appears as to acceptance by the political subdivision, as public parks, squares or similar uses ..., and no longer necessary or practicable for such purposes, and granting orphans' courts jurisdiction with respect thereto.

Act of Dec. 15, 1959, P.L. 1772, title; *see* 53 P.S. § 3381, Historical and Statutory Notes. From this phraseology, the majority considered it clear that the General Assembly intended application to properties donated as public parks, squares, or similar uses; to properties otherwise so dedicated; *and* to properties offered for dedication where no formal record appears as to acceptance. Addressing the punctuation, the majority reasoned:

Indeed, but for the comma between "offered for dedication" and "where no formal record appears" the restrictive application of the qualifying language would be readily apparent. Another rule of construction states, however: "In no case shall the punctuation of a statute control or affect the intention of the General Assembly in the enactment thereof but punctuation may be used to aid in the construction thereof if the statute was finally enacted after December 31, 1964." 1 Pa.C.S. § 1923(b).

*Erie Golf Course,* 963 A.2d at 612.

Thus, as to both the Act's title and Section 2, the majority applied the conventional notion that the qualifier ("where no formal record appears as to acceptance") pertained only to the terms immediately preceding it ("offered for dedication") and did not displace the entire effect of the statute relative to fully-realized dedications. *See Erie Golf Course,* 963 A.2d at 612 (citing *Commonwealth v. Packer,* 568 Pa. 481, 491, 798 A.2d 192, 198 (2002)).

After holding that the DDPA applied, the *en banc* majority addressed the standard governing the orphans' court's assess-

ment of a petition for relief under the Act. From the opening passage of Section 4 ("When, in the opinion of the political subdivision which is the trustee, ...."), the majority gleaned a requirement of substantial judicial deference to a political subdivision's decision to dispose of donated or dedicated property. 53 P.S. § 3384. Moreover, the majority referenced the admonition that "courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power." *Goodman Appeal*, 425 Pa. 23, 30, 227 A.2d 816, 820 (1967). Explaining that Appellants failed to offer evidence that the City's actions were *ultra vires* or wrongful, the majority determined that the orphans' court erred by failing to accord sufficient deference to the City.

Judge Pellegrini authored the dissenting opinion. *See Erie Golf Course*, 963 A.2d at 614–15 (Pellegrini, J., dissenting). While recognizing the fact of the conveyance to the City, the dissent took the position that the property was not donated as a gift or dedicated for public use.[7] Rather, appearing to consider purchase and dedication as mutually exclusive, the dissent highlighted the City's tender of consideration connected with the initial acquisition of the property. Evidently, pursuant to Section 6 of the Act ("Nothing in this act shall be construed to limit or affect the control by a political subdivision of public lands ... acquired by such political subdivision by purchase or condemnation."), Judge Pellegrini concluded that the statute simply did not apply and the orphans' court lacked jurisdiction to approve or disapprove a sale. *See id.* at 615.

Presently, Appellants advance the rationale that prevailed in the orphans' court, *Vutnoski*, and *Bangor*, maintaining that the public trust doctrine—and not the DDPA—governs fully-realized dedications. Appellants portray the public trust doc-

7. Curiously, although relying on a very broad dictionary definition of dedication, "to open for public use," *see Erie Golf Course*, 963 A.2d at 615 (Pellegrini, J., dissenting), the dissent appears to have rejected the opening, and long-term public use, of the property, consistent with an authorizing ordinance and restrictive covenant, as comprising such a dedication.

trine as vigorous, unwavering, and vital public policy, consistent with the strong pronouncements of *Philadelphia Museums*. According to Appellants, the Act's purpose was merely to supplement essential public-trust protection by confirming its application in circumstances where uncertainty otherwise might exist. *Accord* Brief for *Amicus* Stewart Hall, L.P. at 8 (positing that the Act "merely provides a relaxed standard of public trust due to the lacking element of public acceptance"). Appellants and their *amici* regard the Commonwealth Court's holding as marginalizing the public trust doctrine by destroying the irrevocable nature of acceptance across the broader category of fully-realized dedications.

While Appellants regard the DDPA as unambiguous on its terms, they also find support for their position in: rules of grammar; [8] the presumption that statutes are not intended to overturn well-established precedent without an express declaration of such purpose, *see In re Holton's Estate*, 399 Pa. 241, 247, 159 A.2d 883, 886 (1960); as well as the prescriptions that the General Assembly does not favor absurd or unreasonable results,[9] does not wish to violate constitutional norms,[10] and means to favor public over private interests. *See* 1 Pa.C.S. § 1922(1), (3), (5). Appellants additionally contend that, if the Act were intended to apply to fully-realized dedications, the Legislature would not have found it necessary in Section 3 to specify that property subject to the Act "shall be deemed to be held by such political subdivision, as a trustee, for the benefit

8. *See, e.g.*, Brief for Appellants at 22 ("Simple rules of grammar are all that are necessary to see that the phrase 'where no formal record appears as to acceptance by the political subdivision . . .' modifies the entire clause preceding it.").

9. Appellants invoke this principle in association with their perspective that the Commonwealth Court's construction subjugates the public trust to the "whims of public officials." Brief for Appellants at 23.

10. In this regard, Appellants allude to property rights of donors, *see* Brief for Appellants at 23 ("[T]hose who donate or dedicate land to the public have a justifiable expectation that when a municipality accepts these gifts or other transfers under terms and conditions, that the municipality will remain true to its agreement."), as well as the public at large, *id.* at 23–24 ("[A]pplying the Act to properties clearly dedicated and formally accepted by the municipality . . . essentially negates the public's interest in donating property to local governments.").

of the public." *See* Brief for Appellants at 25 ("Under the Commonwealth Court's reasoning, properties that were formally dedicated and accepted as public property would be 'deemed' to be what they already are."). Like Judge Pellegrini, Appellants believe that Section 6 expressly exempts from the coverage of the DDPA property, such as the Erie Golf Course, which was purchased for valuable consideration and relegated to public use via authorizing ordinance and restrictive covenant.

As concerns the Act's scope, Appellants' *amici* offer a series of policy arguments, expressing a concern that increased alienability will discourage directed donations and dedications.[11] They also fear a depletion of vital public resources, particularly in light of current economic challenges facing governmental bodies.[12] Relatedly, in its *amicus* brief, the Department of Conservation and Natural Resources explains that it awards grants amounting to hundreds of millions of dollars to facilitate local community acquisition and development of parkland, recreation, and conservation areas. According to the Department, the commitments and deed restrictions required for participation in the program are an essential component, and "[t]he Commonwealth Court's broad application of the Act jeopardizes the large investment Commonwealth taxpayers have made through DCNR to make commu-

11. *See, e.g.,* Brief for *Amici* the Pa. Land Trust Ass'n, *et al.* at 18 ("People and organizations will not deed or donate property, particularly parkland if the City is going to sell it, particularly for short term economic gain or purposes."); Brief for *Amicus* Stewart Hall, L.P. at 9 ("If this precedent were allowed to stand, it would erode the public trust in political subdivisions to protect public properties such as parks, and this eroded trust would also have a chilling effect upon individuals who are considering a grant for the public benefit.").

12. *See* Brief for *Amici* the Pa. Land Trust Ass'n, *et al.* at 30 ("Without the Public Trust Doctrine, the Pandora's Box of municipalities selling parkland for short term economic gain will be forever opened."); Brief for *Amicus* Stewart Hall, L.P. at 23 ("The [Commonwealth Court] majority's deference to economic feasibility, while appearing innocent enough in the context of an expensive and allegedly underused golf course, exposes all parklands and other public properties to temporary political needs. Parklands and other public properties rarely pay for themselves, and should be measured in terms other than their economic feasibility.").

nity parks and recreation facilities permanently available for the enjoyment of the citizens of the Commonwealth." Brief for *Amicus* DCNR at 2–3.

To the degree the DDPA applies, Appellants also denounce the Commonwealth Court's adoption of a bad-faith standard curtailing the orphans' court review, contending that it lacks grounding in the Act and is tantamount to a conferral of "unfettered discretion" to dispose of public trust property. *See, e.g.,* Brief for Appellants at 10 ("Here, under the Commonwealth Court's decision thousands of gifts and grants to the public use and purchases of property for the public use that have been formally accepted and dedicated to public use by political subdivisions are now at the risk of the whim of public officials who for financial concerns and/or political favors choose to liquidate public trust assets."). Appellants observe that the *Goodman Appeal* decision, relied on by the Commonwealth Court majority to support considerable deference to municipalities, actually stressed the substantial common-law and statutory protections applicable in public trust scenarios and ultimately disapproved a sale of trust property. *See id.* at 27, 227 A.2d 816 (citing *Goodman Appeal,* 425 Pa. at 30–31, 227 A.2d at 820–21). Appellants and their *amici* regard robust orphans' court review as integral to an essential system of checks and balances under the Act.

Along these lines, Appellants contend that the DDPA itself places it squarely within the purview of the orphans' court— and not a municipality seeking to divest itself of its fiduciary obligations—to determine whether the designated use of dedicated property is no longer practicable and what relief, if any, should be afforded to a municipality. *See id.* at 29, 227 A.2d 816 ("If the intent of the legislature was to provide a political subdivision an unfettered right to make political decisions with no meaningful review, then the additional procedural protections afforded by the Act would be superfluous."). Appellants and their *amici* also reference the Act's provision for public involvement in the approval process, *see* 53 P.S. § 3385 (providing for various notice, intervention, protest, and public-hearing rights favorable to the Attorney General and private

residents and organizations), as confirming that the Legislature intended close review of the disposition of public trust property. *See, e.g.,* Brief for *Amicus* Stewart Hall, L.P. at 21 ("The right of the public to present evidence in opposition to such a sale would be a pointless concession if the [Act's] restrictions were replaced by the [highly deferential] standard of review applicable to administrative or legislative actions.").

The City, on the other hand, maintains that the Commonwealth Court's decision is fundamentally correct. According to the municipality, the Act essentially codifies the common-law public trust doctrine, while, at the same time, moderating its inflexibility by offering a "dispositional process for transfer of real property burdened by impracticable restrictions of unlimited duration." Brief for Appellee at 7. The City contends that, in light of the rules of statutory construction, the DDPA pertains to dedicated property where there is a formal record of acceptance, since statutory relief is favored over common law redress, *see* 1 Pa.C.S. § 1504; a statutory remedy is generally exclusive, *see Lurie v. Republican Alliance,* 412 Pa. 61, 63, 192 A.2d 367, 369 (1963); all aspects of a statute must be given due effect, *see* 1 Pa.C.S. § 1921(a); and, ordinarily, qualifying words are to be applied to the terms immediately preceding them. *See Packer,* 568 Pa. at 491, 798 A.2d at 198. Consistent with the reasoning of the Commonwealth Court majority, the City emphasizes the Act's multiple references to completed dedications and suggests these terms would be rendered meaningless by sharply restricting the Act's scope to the no-formal-acceptance scenario.

According to the City and its *amicus,* the Pennsylvania State Association of Township Supervisors, the Act's legislative history strongly supports its broader applicability. With reference to the original bill, they explain that there was no question that it was intended to apply to the greater class of donated and dedicated property, since the bill did not contain the no-formal-acceptance proviso. This qualifier was integrated into the bill, throughout its various sections, via an amendment in the final stages of consideration, upon the third reading in the House of Representatives. *See* 1959 Pa. Leg. J.—House, at 2825–26 (Aug. 11, 1959). The City and its

*amicus* offer such history as strong evidence that the no-formal-acceptance language was not intended to severely curtail the application of the DDPA. Rather, they believe it was added merely to clarify the Act's extension to public-trust property, even where a political subdivision's records are incomplete. *See* Brief for Appellee at 14; Brief for *Amicus* Pa. State Ass'n of Twp. Supervisors at 18–19.

Citing *Goodman Appeal,* the City also maintains that the orphans' court erred by failing to defer to its own considered judgment in the impracticability assessment, particularly in terms of the economic considerations. Although the position is implicit in Appellants' arguments and in the Commonwealth Court's opinion, *amicus* Borough of Downingtown directly asserts that the DDPA empowers orphans' courts to free land titles from formal deed restrictions. *See* Brief for *Amicus* Borough of Downingtown at 18.

Responding to Appellants' policy arguments, the City contends that the Act contains sufficient safeguards to counter political "whims." *See supra* note 9. In particular, *amicus* Borough of Downingtown advises that donors will understand that gifts given in perpetuity are subject to the effect of unforeseen changes in circumstances. *See* Brief for *Amicus* Borough of Downingtown at 25. Perhaps in tension with the other arguments in defense of the Commonwealth Court's deferential perspective, the Borough highlights checks and balances under the Act, particularly in terms of the requirement of judicial involvement. Indeed, according to the Borough, Appellants' vision of an irrevocable trust would dissuade municipalities from accepting donations and dedications. *See id.* at 26 ("No rational political unit could accept a future offer of dedication if ... the economic obligations created thereby are inescapable even in the face of literal impossibility.").

Finally, Downingtown Borough supplies another worthy perspective. In the first instance, the Borough observes that the common law public trust doctrine was not as inflexible as portrayed by Appellants, since the inherent judicial authority to adapt perpetual gifts to changed circumstances was always recognized. *See id.* at 20 (citing *Payne v. Kassab,* 468 Pa. 226,

238, 361 A.2d 263, 269 (1976) ("It is equally well established ... that diversion of dedicated land from one public use to another may be approved in a proper case.")).[13] The Borough regards this limited and controlled latitude, as reflected in both the common law and the Act, as analogous to the *cy pres* doctrine prevailing in the charitable-trusts context. *See, e.g., In re Miners' & Laborers' Beneficial Fund of Phila. and Reading Coal & Iron Co.*, 445 Pa. 65, 75, 282 A.2d 688, 693 (1971). Given that "eleemosynary gifts in perpetuity create unique difficulties," the Borough argues:

> In these situations the public good demands a procedure by which an objective, respected, disinterested institution possessed of the requisite societal respect, power, experience, and expertise is granted the power and authority, on application of interested parties, to hear the factual particulars of the original gift and the changes that have rendered that gift impractical or impossible of fulfillment, indefinite of object, or otherwise no longer in the public interest[.] [T]hen, with suitable restrictions requiring only the minimum deviation necessary, [the chancellor may] allow the substitution of a new program or charitable/public object so that the grantor's original intent can be fulfilled over time as nearly as possible.
>
> \*　　\*　　\*
>
> The Act is no more or less than the public analog of the rule of *Cy Pres* and the public interest will not be served if, as the trial court here held, the chancellor's authority with respect to public gifts is substantially narrower in its scope than the analogous power to address the identical difficulties faced in connection with testamentary charitable gifts.

Brief for *Amicus* Borough of Downingtown at 28–29.

▆ We allowed appeal to address the sharp controversy over the DDPA's scope and the Commonwealth Court's re-

13. *Cf. Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453, 13 S.Ct. 110, 118, 36 L.Ed. 1018 (1892) ("The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands ... remaining.").

mand decision. As these matters concern statutory construction, we are presented with questions of law subject to plenary review.

At the outset, the guiding principles of statutory construction are ably developed in the parties' arguments. Briefly, our task is to discern the intent of the Legislature, and, in doing so, we first look to the Act's plain language. As is evident from the arguments presented in this case, however, the Act contains substantial ambiguities which require the application of other approaches.

For example, and central to the present dispute, a core ambiguity arises out of the placement of the lack-of-acceptance qualifier at the end of a series of potential subjects. *See* 53 P.S. § 3382. For this reason, both parties are able to advance colorable arguments that the Act includes, or excludes, dedicated property where there is a formal record. Moreover, the statute lacks definitions for central concepts, such as "dedication" and "purchase." For instance, there is no guidance concerning whether "purchase" contemplates a fair-market-value exchange (as opposed to encompassing an exchange upon lesser or nominal consideration), and, particularly if not, whether the concepts of "dedication" and "purchase" are intended to be mutually exclusive.[14] The difficulty is compounded by the somewhat obscure direction, in Section 6, that a political subdivision's "control" is not limited or affected by the Act in purchase scenarios. 53 P.S. § 3386.[15] This, in turn,

14. In the decisional law, courts have considered purchased property to be "dedicated" upon a municipality's commitment of the property to public use and acceptance by the public. *See, e.g., Phila. Museums,* 251 Pa. at 123, 96 A. at 125; *cf. Coffin v. Old Orchard Dev. Corp.,* 408 Pa. 487, 491, 186 A.2d 906, 909 (1962) ("Dedication of land results when a landowner offers property for public use and it is accepted by or in behalf of the public ..."). In such cases, the landowner/dedicator is the political unit, as opposed to the original seller. Of course, this form of dedication would not be covered by the DDPA, despite the Act's facial applicability, if the fact of the purchase were disqualifying in the first instance.

15. At least on its face, Section 6 appears intended to protect the rights a municipality may have acquired in connection with a purchase. Paradoxically, however, preexisting law was more restrictive than the Act concerning alienability of purchased property dedicated to public use,

raises the question of whether property that in any sense of the word can be regarded as "purchased" is entirely excluded from the DDPA's coverage.

In view of such apparent ambiguities, the Commonwealth Court's resort to additional principles of statutory construction was appropriate. *See* 1 Pa.C.S. § 1921(c).

Concerning its analysis of the threshold issue involving the Act's scope, we find the court's reasoning to be primarily correct. The Commonwealth Court majority ably contextualized the lack-of-acceptance proviso and persuasively reasoned that the narrowing construction favored by Appellants too greatly impacted the effectiveness of various other provisions of the statute. *See Erie Golf Course*, 963 A.2d at 611–12; 1 Pa.C.S. § 1921(a). This analysis is complemented by the legislative history of the DDPA, as developed by the City and Downingtown Borough. In answer to Appellants' argument that the Legislature never intended the Act to apply to fully-realized dedications, this history demonstrates that this, in fact, was intended from the outset. *See* 1 Pa.C.S. § 1921(c)(7) (authorizing consultation of the contemporaneous legislative history as a tool of statutory construction). The addition of the lack-of-acceptance qualifier as an eleventh-hour amendment, with no accompanying structural changes to the statute, strongly suggests that the modifier was designed to supply clarification to the Act, not to effectuate a dramatic revamping of its overall reach. The title, structure, substance, and history support the conclusion that the Donated or Dedicated Property Act was intended to extend across the broader class of dedications.

▮ In response to the argument of Appellants and their *amici* that the Legislature would not have needed to provide rights in the DDPA that already existed under the public trust doctrine, we agree with the contrary perspective that the referenced provisions of the Act merely incorporate salient common-law principles. Such an approach to the drafting of

as the public trust doctrine applied. *See supra* note 14. Thus, applying Section 6 to all property that can in any sense of the word be considered "purchased" would appear to render the section self-defeating.

statutes is neither unusual nor superfluous. We also agree with the Commonwealth Court and the City that, through the Act, the Legislature both specified the fiduciary nature of municipalities' obligations relative to donated and dedicated properties and provided for orderly relief therefrom in appropriate circumstances. *See* 53 P.S. §§ 3383-3384.[16]

The more difficult questions in the appeal concern the role of the orphans' court and the effect of the DDPA on restrictive covenants.

■ In terms of orphans' court review, we differ with the Commonwealth Court's finding that the primary discretion involved lies with a municipality seeking relief from its fiduciary obligations. In so holding, the court relied on the opening sentence of Section 4, 53 P.S. § 3384 ("When, in the opinion of the political subdivision which is the trustee, the continuation of the original use of the particular property held in trust as a public facility is no longer practicable or possible and has ceased to serve the public interest, ... the trustee may apply to the orphans' court ... for appropriate relief."). *See Erie Golf Course*, 963 A.2d at 613. Such passage, however, does not vest controlling discretion in the political subdivision; rather, it merely specifies under what circumstances the municipality, as trustee, may file an application in an orphans' court. The controlling discretion is squarely reposited in the court. *See* 53 P.S. § 3384 ("The court *may* permit the trustee to" substitute lands or sell the property subject to various prerequisites and conditions (emphasis added)).

■ In this regard, we agree with *amicus* Downingtown Borough, which argues (albeit for distinct purposes) that the Act shares considerable similarities with the *cy pres* doctrine applicable to charitable trusts. Notably, under the *cy pres* doctrine, a trustee has no discretion to divert from purposes specified by a settlor;[17] rather, the trustee may only lodge an

16. To the extent the Act modifies the public trust doctrine, the prior common-law principles are superseded. *See Sternlicht v. Sternlicht*, 583 Pa. 149, 163, 876 A.2d 904, 912 (2005).

17. An exception prevails where the trust instrument itself expressly grants the trustee the power to determine whether the original trust

application in a court of equitable jurisdiction, which then exercises its sound discretion in assessing the availability and nature of relief. *Cf. In re Estate of Elkins*, 888 A.2d 815, 823–24 (Pa.Super.2005) (explaining that the orphans' court is tasked with concluding whether the charitable purpose of a trust is no longer practical). *See generally* Chester, *et al.*, BOGERT'S TRUSTS AND TRUSTEES § 435; 14 C.J.S. CHARITIES § 49 (2009) ("The application of the cy pres doctrine, with regard to a charitable trust, involves a great measure of judicial discretion[.]"). The decision of the court of original jurisdiction is subject to deferential appellate review. *See, e.g., In re Women's Homeopathic Hosp. of Phila.*, 393 Pa. 313, 316, 142 A.2d 292, 293–94 (1958) (prescribing an error of law or manifest abuse standard).

The careful control exercised by the courts in the *cy pres* arena is on account of the extraordinary nature of a diversionary remedy impacting important rights and interests of the settlor and the public. Such concerns also pertain under the Donated or Dedicated Property Act, and, thus, we believe the Legislature reposited the appropriate discretion in the orphans' court, and not the trustee, for conventional, and very good, reasons.[18] While substantial deference may be due generally to discretionary administrative and legislative acts, presently, the sale of the property was not discretionary with the City in the first instance in light of its fiduciary obligations and recorded covenant.

purposes have become impossible or impracticable and to devise a plan for carrying out charitable intentions different from those provided by the settlor. *See* Ronald Chester, *et al.*, BOGERT'S TRUSTS AND TRUSTEES § 435 (2009).

**18.** The present codification of the *cy pres* doctrine utilizes more mandatory terms relative to orphans' court approval. *See* 20 Pa.C.S. § 7740.3 (prescribing that, upon a finding that original charitable purposes have become unlawful, impracticable, or wasteful, the court *"shall* apply cy pres to fulfill as nearly as possible the settlor's charitable intention" (emphasis added)). Significantly, however, the DDPA utilizes the permissive phraseology, consistent with a wider conferral of discretion.

Moreover, as Appellants stress, the *Goodman Appeal* decision upon which the Commonwealth Court relied is more nuanced than was recognized. *See Goodman Appeal*, 425 Pa. at 30–31, 227 A.2d at 820–21.

 Based on the above, we differ with the standard governing orphans' court review set by the Commonwealth Court, entailing a manifest abuse on the part of a municipality seeking relief from its trust obligations. Rather, we hold that the essential discretion lay in the orphans' court, to which appellate court deference is due, and we will remand for further appellate review by the Commonwealth Court subject to this controlling principle.[19]

Lastly, we give our attention to two final matters touched upon by the parties, namely, the proper construction of Section 6 as it relates to "purchased" property, *see* 53 P.S. § 3386, and the impact of the DDPA on the formal deed restriction.

 As to Section 6, we have observed that the statute is ambiguous and potentially paradoxical. *See supra* note 15. Further, we differ with the notion (which is at least implicit in the Commonwealth Court dissent) that a bright line separates dedications and purchases, since, under the governing principles, purchased property can be committed to the public trust. *See supra* note 14. Given the overlap, we find it most reasonable to construe Section 6 as redressing a concern for the preservation of such rights and interests as a political subdivision may have acquired in connection with a purchase. *See Stozenski v. Borough of Forty Fort,* 456 Pa. 5, 10, 317 A.2d 602, 606 (1974) (distinguishing between rights of a municipality as an offeree of a dedication and rights as a grantee resulting from a purchase). We do not believe, however, that the provision was intended to remove entirely from the Act's purview (and thus maintain inflexible irrevocability relative to) any and all trust property that may in any sense of the word be said to have been purchased.

 With regard to the deed restrictions, in light of the orphans' court's limited construction of the DDPA, and the Commonwealth Court's directive for deferential judicial review, we find that relevant legal principles are not in sharp

19. Although Appellants' position has not prevailed on the threshold issue, we note that the policy concerns raised by their *amicus, see, e.g., supra* note 11, are mitigated by appropriate recognition of the close review available to, as well as the discretionary prerogative of, the orphans' courts.

focus at the present time. Thus, at this juncture, we will say only that the argument that the General Assembly did not contemplate disrupting recorded restrictive covenants in the DDPA is colorable. We note particularly the absence of any express reference in the Act to deed restrictions;[20] the important interests they may protect, such as those advanced by DCNR; and the purpose of attachment to the land as providing the strongest assurance of security and longevity.[21] Thus, while, again, we defer our own consideration in light of the course this matter has taken, we recognize that approval of a sale of the property over the recorded restrictive covenant, at least against relevant objection, will require a close examination of the authority conferred under the Act relative to property rights running with land and, to the degree the Act does not supply the necessary authority, governing property-law principles.

We hold that the DDPA applies to fully-realized dedications, as well as to ones where there may be uncertainty as to the acceptance. Further, we hold that the Commonwealth Court erred in remanding at this juncture, in the absence of deferential appellate review of the discretionary aspects of the orphans' court's decision.

The order of the Commonwealth Court is vacated, and the matter is remanded for further proceedings consistent with this opinion.

20. Instead, the Act speaks only to dedications formalized through offer and acceptance, and not to the destruction of independent property rights running with the land. *Cf. City of Huntington Woods v. City of Detroit*, 279 Mich.App. 603, 761 N.W.2d 127, 143 (2008) (holding that, to the extent a municipality could obtain approval to sell a golf-course/park property, the land would remain burdened by the restrictive covenant providing for public use). Notably, as contrasted with recorded restrictive covenants, no particular formalities are necessary to accomplish dedication; all that is necessary are clear expressions of intention. *See Coffin*, 408 Pa. at 491–92, 186 A.2d at 909.

21. While various of the advocates have suggested that relief from such covenants may be available pursuant to other property-law principles, *see generally Vernon Twp. Volunteer Fire Dep't v. Connor*, 579 Pa. 364, 375, 855 A.2d 873, 879 (2004), it is beyond the scope of this appeal to comment further on the availability of such remedies or the procedure for securing them.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, and Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.